**Slip Op. 18- 78**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **NANTONG UNIPHOS CHEMICALS CO., LTD., and NANJING UNIVERSITY OF CHEMICAL TECHNOLOGY CHANGZHOU WUJIN WATER QUALITY STABILIZER FACTORY,** | |
| Plaintiffs, | **Before: Jane A. Restani, Judge** |
| v. | |
| **UNITED STATES,** | **Court No. 17-00150** |
| Defendant, | **PUBLIC VERSION** |
| and | |
| **COMPASS CHEMICAL INTERNATIONAL LLC,** | |
| Defendant-Intervenor. | |

## OPINION

Dated: June 25, 2018

[Commerce's final results in an investigation of 1-Hydroxythylidene-1, 1-Disphosphonic Acid from the People's Republic of China are sustained.]

David Craven, Sandler, Travis & Rosenberg, PA, of Chicago, IL, for the Plaintiffs Nantong Uniphos Chemicals Co., Ltd., and Nanjing University of Chemical Technology Changzhou Wujin Water Quality Stabilizer Factory.

Kelly Krystyniak, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. Of counsel on the brief were Nikki Kalbing and Zachary Simmons, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Jeffrey Levin, Levin Trade Law, P.C., of Bethesda, MD, for Defendant-Intervenor Compass Chemical International LLC.

**Restani, Judge**:  In this action challenging a final determination and countervailing duty

order issued by the United States Department of Commerce ("Commerce") regarding 1-

Hydoxythylidene-1, 1-Disphosphonic Acid ("HEDP") from the People's Republic of China

("PRC"), Nantong Uniphos Chemicals Co., Ltd. ("Nantong") and Nanjing University of

Chemical Technology Changzhou Wujin Water Quality Stabilizer Factory ("Wujin")

(collectively, "Plaintiffs") request the court hold Commerce's countervailing duty to be

unsupported by substantial record evidence or otherwise not in accordance with law. Plaintiffs

accordingly request the court remand the final determination with directions to find cross-

ownership between Plaintiffs, or to calculate an individual duty rate for Nantong.

## BACKGROUND

Prompted by the petition of Compass Chemical International LLC, a domestic producer,

Commerce initiated a countervailing duty ("CVD") investigation of HEDP from the PRC.  1-

Hydroxyethylidene-1, 1-Diphosphonic Acid From the People's Republic of China: Initiation of

Less-Than-Fair-Value Investigation, 81 Fed. Reg. 25,377, 25,377 (Dep't Commerce Apr. 28,

2016).[1]  The period of investigation ("POI") was July 1, 2015, through December 31, 2015.  Id.

Using POI sales data, Commerce selected the PRC's top two producers or exporters of United

States-bound HEDP as mandatory respondents:  Wujin and Shandong Taihe Chemicals Co., Ltd.

("Taihe").  Respondent Selection, C-570-046, POI 01/01/15 – 12/31/15, at 4 (Dep't Commerce

June 8, 2016) ("Respondent Selection Memo").  Nantong was one of seven significant HEDP

producers or exporters to submit POI sales volume data, but was not selected.  Id. at Attach.1.

---

[1] Hereinafter, citations to administrative record documents will omit the pre-colon "1-
Hydroxyethylidene-1, 1-Diphosphonic Acid From the People's Republic of China" portion.

Early in the investigation, Wujin identified Nantong as its affiliate. Response of Nanjing University of Chemical Technology Changzhou Wujin Water Quality Stabilizer Factory to Affiliated Company Portion of Section III, C-570-046, POI 01/01/15 – 12/31/15, at 1, Ex. CVD-1 and CVD-2 (Dep't Commerce June 22, 2016) ("Wujin Sec. III Response"). Ultimately, Nantong also supplied a full questionnaire response. See generally Response of Nantong Uniphos Chemicals Co., Ltd to Affiliated Company Portion of Section III, C-570-980, POI 01/01/2013-12/31/2013 (Dep't Commerce July 18, 2016) ("Nantong Sec. III Response"). Commerce thereafter issued a supplemental questionnaire asking Wujin to explain, inter alia, aspects of Nantong and Wujin's corporate structures. Supplemental Questionnaire for Initial Questionnaire Response, C-570-046, POI 01/01/15 – 12/31/15, at Attach., p. 1 (Dep't Commerce Aug. 10, 2016) ("Second Supp. Q."). Wujin's response indicated that "all of the requested detail has already been provided" regarding Wujin's ownership of Nantong. Response to Department's Second Supplemental CVD Questionnaire, C-570-046, POI 01/01/15 – 12/31/15, at 2 (Dep't Commerce Aug. 15, 2016) ("Second Supp. Q. Response").

In its Preliminary Determination, Commerce found no cross-ownership because Wujin was not a majority shareholder of Nantong and no other evidence indicated Wujin could use Nantong's assets as its own. Decision Memorandum for the Preliminary Determination, C-570-046, POI 01/01/15 – 12/31/15, at 5–6 (Dep't Commerce Aug. 29, 2016) ("Prelim. I&D Memo"). Commerce issued a third supplemental questionnaire, requesting further information on the relationship between Wujin and Nantong. Department's Third Supplemental CVD Questionnaire, C-570-980, POI 01/01/2013-12/31/2013, at 3–4 (Dep't Commerce Sept. 9, 2016) ("Third Supp. Q."). Wujin submitted a response, Wujin Water's Response to Department's

Third Supplemental CVD Questionnaire, C-570-980, POI 01/01/2013-12/31/2013 (Dep't

Commerce Sept. 26, 2016) ("Third Supp. Q. Response"), and both Wujin and Nantong were

thereafter subject to on-site verification, see generally Verification of the Questionnaire

Responses of Nanjing University of Chemical Technology Changzhou Wujin Water Quality

Stabilizer Factory; Nantong Uniphos Chemicals Co., Ltd.; and Changzhou Wujin Fine Chemical

Factory Co., Ltd., C-570-046, POI 01/01/15 – 12/31/15 (Dep't Commerce Jan. 10, 2017)

("Verification Report").  Having the benefit of these verifications, Commerce's Final

Determination nevertheless found that Wujin and Nantong were not cross-owned.  Issues and

Decision Memorandum for the Final Affirmative Determination, C-570-046, POI 01/01/15 –

12/31/15, at 11–13 (Dep't Commerce Mar. 20, 2017) ("Final I&D Memo"); see also Final

Affirmative Determination, 82 Fed. Reg. 14,872, 14,873 (Dep't Commerce Mar. 23, 2017)

("Final Determination").  Ultimately, Commerce assigned a de minimis countervailing duty to

Wujin, but assigned Nantong the "All-Others" duty rate: 2.40 percent.  Countervailing Duty

Order, 82 Fed. Reg. 22,809, 22,810 (Dep't Commerce May 18, 2017).[2]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a) (2012).  Commerce's final

results in a countervailing duty investigation are upheld unless "unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

---

[2] Taihe's rate was the only non-de minimis rate, or rate not based entirely on facts otherwise available.  Thus, the "All-Others" rate is Taihe's rate.  Final Determination, 82 Fed. Reg. at 14,873.

Commerce generally attributes subsidies to goods produced by the company receiving the

subsidy.  19 C.F.R. § 351.525(b)(6)(i).  Pursuant to Commerce's regulations, however, subsidies

received by cross-owned corporations are jointly attributed to subject merchandise produced by

both corporations.  See 19 C.F.R. § 351.525(b)(6)(ii).  In practice, both corporations thus receive

a single countervailing duty rate.  Plaintiffs contend that if Commerce had included Nantong's

subsidies in Wujin's subsidy rate calculations, both companies would have been subject to a de

minimis duty rate.  Pl. Br. at 15.  In failing to find cross-ownership between Nantong and Wujin,

Plaintiffs argue, Commerce failed to properly apply 19 C.F.R. § 351.525(b)(6)(vi).  Pl. Br. at 8–

13.

> This section defines cross-ownership as follows:
>
> Cross-ownership exists between two or more corporations where one corporation
> can use or direct the individual assets of the other corporation(s) in essentially the
> same ways it can use its own assets.  Normally, this standard will be met where
> there is a majority voting ownership interest between two corporations or through
> common ownership of two (or more) corporations.

19 C.F.R. § 351.525(b)(6)(vi).  According to the regulatory preamble, the consideration

underlying this rule is the merging of corporate interests.  See Countervailing Duties, 63 Fed.

Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998).  Regarding shareholding percentages, the

preamble indicates:

> Cross-ownership does not require one corporation to own 100 percent of the other
> corporation.  Normally, cross-ownership will exist where there is a majority
> voting ownership interest between two corporations or through common
> ownership of two (or more) corporations.  In certain circumstances, a large
> minority voting interest (for example, 40 percent) or a "golden share" may also
> result in cross-ownership.

Id.  Common ownership, therefore, is a fact-specific determination and calculating the

percentage ownership of a company is not the end of the inquiry.[3] This is reflected in

Commerce's practice. See Issues and Decision Memorandum for the Final Affirmative

Determination in the Countervailing Duty Investigation of Melamine from Trinidad and Tobago,

C-274-807, POI 01/01/2013–12/31/2013, at 4 (Dep't Commerce Oct. 30, 2015) ("the agency

must look at the facts presented in each case in determining whether cross-ownership exists").

Nantong was established in March 2011. Verification Report, at 4. Wujin acquired its

shares of Nantong in November 2014, the same year Nantong began HEDP production. Wujin

Verification Exhibits, C-274-807, POI 01/01/2013–12/31/2013, at Ex. 15(b) (Dep't Commerce

Nov. 14, 2016) ("Verification Exhibits"); Verification Report, at 5. Wujin held these shares at

the same level throughout the POI, during which Wujin was Nantong's second-largest

shareholder, at [[      ]], the largest shareholder having [[      ]] and the third and final

shareholder having [[     ]]. Verification Exhibits, at Ex. 15(b); Verification Report, at 5.

During the POI, three Wujin directors sat on Nantong's eight-person board. Id. The largest

shareholder also had three directors on Nantong's board. Verification Report, at 5. During the

POI, Wujin was in the process of shutting down its HEDP production and shifting production to

Nantong. Third Supp. Q. Response, at 5. This process was not completed until after the POI.

Id. at 4–5.

Wujin's shareholder status, the shared directors, and Wujin's post-POI shutdown and

subsequent transfer of production were all acknowledged in Commerce's final determination.

---

[3] The regulatory preamble expressly distinguishes the "cross-ownership" defined by 19 C.F.R. §
351.525(b)(6)(vi) from the broader concept of "affiliation," found in 19 U.S.C. § 1677(33). 63
Fed. Reg. at 65,401. Affiliation is seen as a lower bar. Id. See also Beijing Tianhai Indus. Co.
v. United States, 52 F. Supp. 3d 1351, 1366 n.20 (CIT 2015).

<u>Final I&D Memo</u>, at 11. Commerce found no evidence of majority ownership, veto power, or golden shares, and concluded that two-out-of-three shareholders were needed to direct or control Nantong. <u>Id.</u> at 12. In Commerce's view, Wujin thus presented insufficient evidence of cross-ownership. <u>Id.</u> Commerce found further evidence of events after the POI to be irrelevant. <u>Id.</u>

Plaintiffs now renew their argument that Nantong was cross-owned by Wujin within the meaning of Section 351.525(b)(6)(vi). Section 351.525(b)(6)(vi) couches the cross-ownership inquiry in terms of the power to control, e.g., that Wujin "can use" rather than actually uses Nantong's assets. Logically, actual use predicated upon other shareholders' consent does not necessarily suggest the degree of control necessary to unilaterally use corporate assets.

Taken together, facts adduced by Plaintiffs indicate Wujin had a significant voice at the highest level of Nantong's operations, perhaps even controlling Nantong's sales personnel. Verification Report, at App'x II (showing Nantong and Wujin as having the same sales manager at time of verification). Although, for example, a forty percent minority shareholder might wield <u>de facto</u> control over the use or disposition of corporate assets where all other shareholders hold a two percent stake, such power is not clearly found where there are only three minority shareholders, and all hold significant percentage stakes. In Nantong's case, any two shareholders could have directed all but the most fundamental corporate actions without the third shareholder's approval.[4] Considering this, Commerce could, and did, reasonably find that Wujin

---

[4] Each director held one vote. Nantong Sec. III Response, at Ex. 7. Actions requiring a two-thirds vote of Nantong directors, and which Wujin could thus veto, include: revision of the by-laws, increase or decrease in registered capital, merger, split-up, or dissolution. <u>Id.</u> Other actions required only a simple majority. <u>Id.</u> All board meetings require two-thirds of directors be present. <u>Id.</u>

alone did not control Nantong.  Final I&D Memo, at 11–13.  The background of Nantong's

formation bolsters Commerce's conclusion.  One could reasonably infer that Wujin invested in

Nantong in order to pool its resources with other chemical producers.  See Third Supp. Q.

Response, at 4–5.  Nantong was a joint venture in which each participant sacrificed a significant

degree of control, but enjoyed economies of scale.[5]  See id.  This is so, even if, arguendo, the

court accounts for Wujin's post-POI transfer of HEDP production to Nantong.[6]

Alternatively, Plaintiffs argue that, because Commerce obtained and verified data

necessary to calculate an individual rate for Nantong, Commerce erred in failing to do so.  Pl. Br.

at 14.  Where the total number of producers is too large to calculate a countervailing duty rate for

each, Commerce may calculate individual rates for a reasonable number of producers.  See 19

U.S.C. § 1677f-1(e)(2).  Specifically, Commerce may limit its examination to:

> (i) a sample of exporters or producers that the administering authority determines
> is statistically valid based on the information available to the administering
> authority at the time of selection, or
> (ii) exporters and producers accounting for the largest volume of the subject
> merchandise from the exporting country that the administering authority

---

[5] In theory, the concept of cross-ownership would also encompass a situation in which Nantong
controlled Wujin.  See 19 C.F.R. § 351.525(b)(6)(ii) (referring simply to "two (or more)
corporations with cross-ownership").  This was argued neither during administrative
proceedings, nor before the court.  The record indicates that Nantong holds no shares of Wujin,
and Wujin's largest shareholder holds a [[      ]] stake.  Nantong Sec. III Response, at 7; Third
Supp. Q. Response, at Ex. CVD3S-3.

[6] The court does not find that Nantong failed to exhaust its administrative remedies regarding
this argument, as the relevance of events outside the POI was raised in Nantong's administrative
case brief.  Case Brief, C-570-046, POI 01/01/2015–12/31/2015, at 3 (Dep't Commerce Jan. 24,
2017).  As for the relevance of 19 C.F.R. § 351.525(b)(6)(v) in particular, Pl. Br. at 5–6, that
provision would not impact the court's reasoning.  That subsection concerns the "[t]ransfer of
subsidy between corporations with cross-ownership producing different products," 19 C.F.R. §
351.525(b)(6)(v), thus co-ownership is a pre-requisite to its application.

CONFIDENTIAL INFORMATION OMITTED

determines can be reasonably examined[.]

Id. § 1677f-1(e)(2)(i)–(ii). In Commerce's Respondent Selection Memorandum, it chose the latter path. Respondent Selection Memo, at 3. The provision under which Commerce acted did not limit its selection of exporters to "information available . . . at the time of selection." Compare 19 U.S.C. § 1677f-1(e)(2)(i) with 19 U.S.C. § 1677f-1(e)(2)(ii). Nevertheless, record evidence indicates that, consistent with Section 1677f-1(e)(2)(ii), Wujin accounted for a larger volume of the subject merchandise than did Nantong. Wujin's HEDP sales data indicated that, during the POI, it sold [[     ]] metric tons, [[     ]] of which were exported to the United States. Third Supp. Q. Response, at Ex. CVD3S-7. The next year, Wujin sold [[     ]] metric tons, [[     ]] of which were exported to the United States. Id. By contrast, Nantong's HEDP sales data show [[     ]] metric tons sold and [[     ]] metric tons exported to the United States over the POI. Nantong Sec. III Response, at Ex. 8-a. The following year, Nantong sold [[     ]] metric tons, [[     ]] of which were exported to the United States. Id. That Commerce analyzed and verified Nantong's submissions in conjunction with its cross-ownership analysis does not then require that Commerce take the further step of calculating a separate rate for Nantong, least of all when Nantong's 2014 and 2015 export numbers were markedly smaller than those of Wujin. Commerce's decision not to calculate a separate rate for Nantong is accordingly supported by substantial evidence.

## CONCLUSION

In all challenged respects, Commerce's <u>Final Determination</u> and Countervailing Duty

Order are **SUSTAINED**.  Judgment will enter accordingly.


<u>/s/ Jane A. Restani</u>
Jane A. Restani, Judge

Dated: June 25, 2018
       New York, New York